In The
*Court of Appeals*
*Ninth District of Texas at Beaumont*
NO. 09-23-00329-CR

FREDRICK HARDEN, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the Criminal District Court
Jefferson County, Texas
Trial Cause No. F21-36557

MEMORANDUM OPINION

A jury convicted Fredrick Harden of murder, a first-degree felony.[1] *See* Tex. Penal Code Ann. § 19.02. In three issues, Harden challenges the sufficiency of the evidence arguing the State failed to disprove self-defense beyond a reasonable doubt,

---

[1]The trial court's judgment lists Harden's name as "FREDRICK HARDEN[,]" "FREDERICK CARNELL HARDEN[,]" and "FREDERICK CORNELL HARDEN[.]"

challenges the trial court's evidentiary rulings, and argues that fundamental error occurred when the State misstated the law of self-defense to the jury. We affirm.

## Background

It is undisputed by the parties that in the early morning hours of December 25, 2020, two fights broke out in the parking lot of a nightclub in Beaumont. It is also undisputed that the victim, Christopher Brown was shot and killed by Harden in the same parking lot.

### Sean Tolley

Sean Tolley, who works for the Beaumont Police Department as the supervisor of the 911 Operations Center, described how phone calls that come into the center are recorded. Copies of 911 phone calls placed on December 25, 2020, were admitted and played for the jury.

### Alec Garcia

Alec Garcia is a narcotics detective with the Beaumont Police Department. He previously worked as a patrol officer and was on patrol in the early morning hours of December 25, 2020, when he received a call around 2:00 a.m. about a shooting in the parking lot of a nightclub in Beaumont. Garcia confirmed he was wearing a body camera that morning, and a copy of the body camera footage was played for the jury. When Garcia arrived, he observed a large crowd in the parking lot, which he estimated to be "a couple hundred people[,]" but noted that most people

2

were leaving the parking lot. Several people were attempting lifesaving measures on the victim. Garcia testified that he can be heard telling people in the parking lot to disperse because the victim was "50, 60 yards on the other side of the front door, … [with] probably a good 40, 50 people" in front of him. He described the scene as having some "pandemonium[,]" with people panicking, but noted that others were "simply standing there." Garcia then approached the victim and observed seven to eight people huddled around him attempting CPR. According to Garcia, the crowd was not being cooperative. Garcia had already asked if anyone had seen anything, and he received no response from the potential witnesses. Garcia eventually identified Brown and Brown's cousin. Garcia also located a 9-millimeter cartridge casing approximately ten feet away from Brown and collected it as evidence. Garcia identified Harden as the shooter.

**Carol Hargroder**

Carol Hargroder testified that she is an ID technician, and processes crime scenes with the Beaumont Police Department. She detailed her education and experience and stated that she processed the crime scene on December 25, 2020. Photographs Hargroder took at the scene were admitted into evidence. Hargroder collected a spent 9-millimeter casing and a live .380 round from the scene. The casing and the live round were processed for fingerprints. According to Hargroder, she did not recover any fingerprints from the two pieces of evidence collected.

**Donald Carson Burrell**

Donald Carson Burrell is a police officer with the Beaumont Police Department. Burrell was called to the scene on December 25, 2020, and performed a "scene diagram[.]" He testified that a scene diagram involves a "total survey station[,]" in which he uses survey equipment to map out the scene in what he calls an "open air homicide[,]" such as this one which occurred in a parking lot. A copy of his scene diagram was admitted at trial.

**Erik "Kelly" Kvarme, Jr.**

Kelly Kvarme is a sergeant with the Beaumont Police Department. He stated that as a sergeant he is a "[s]upervisor, do[es] basic supervisory duties, for -- in terms of the police department, running scenes, approving paperwork, things of that nature." He was called to the scene of the shooting on December 25, 2020. When he arrived, he located the unresponsive victim, and when he ripped Brown's shirt open, he observed a wound to his chest. Kvarme rolled him over and did not see an exit wound. He went back to his car to get first aid, but by that time, EMS had arrived. Kvarme identified several pictures taken at the scene, and a copy of his body camera footage was admitted as evidence. He described the potential witnesses at the scene as "uncooperative[.]" No one approached Kvarme to tell him that Harden acted in self-defense.

**Christopher Price**

Christopher Price was working as a nightclub bouncer on the night of December 25, 2020. He stated that his job duties included keeping the peace, and "mak[ing] sure nothing go[es] on inside the nightclub, as well as the money and everything is accurate at the door." Price stated that the club is open from 10:00 p.m. to 2:00 a.m. He described the club's procedures when it closes and his duties at closing. Before December 25th, Price had never met Brown. Price knows Harden because he is an extended family member.

At closing time in the early morning hours of December 25th, a fight broke out between Harden's niece and another woman in the parking lot of the nightclub. Price broke up the fight between the two women and observed Harden "take the phone [of an unknown individual] and throw it on the ground to break it up because he thought somebody was recording." Price did not know the person who Harden took the phone from, but Harden was punched by that person after breaking the phone. Harden then turned and shot Brown. Price testified that he was "pretty close[,]" approximately 6 feet away from the shooting, and described the weapon used as a "silver 9 millimeter with a…green marble handle." He testified that Harden was the shooter and that he did not observe Harden to be in any apparent danger of being attacked by anyone before the shooting. "It was -- it was literally, like, seconds. After he got punched, [Harden] just turned around, looked, and then just

5

shot." According to Price, after the phone was smashed by Harden and the first punch was thrown by an unknown individual, Brown was observed holding back the unknown individual. He did not believe there was any reason for Harden to have shot and killed Brown. After the shooting, Harden "just like, disappeared[,]" but Price did see him again at the same club a week later. This was noteworthy to Price because by this time Harden was already wanted. Price notified the police because he knew there was a warrant for Harden's arrest, but Harden continued to come to the club several times. Price notified the police each time Harden appeared at the club.

During cross-examination, Price testified that he did not remember another fight in the parking lot besides the one between the two women. According to Price, Brown did not touch Harden and was not trying to attack him when he was shot.

**Nehemiah Martin**

Nehemiah Martin is Brown's cousin and was at the nightclub with him on December 25, 2020. At closing time, he walked out into the parking lot and saw some people arguing and fighting. He testified that two women were physically fighting and the men in the same group were "talking back and forth." Martin began to record the fights with his phone, and a man "behind me…realized I was recording and snatched my phone and slammed it." Before this interaction, Martin testified that he had never spoken or interacted with this man. Martin punched the man after

6

he slammed his phone on the ground. Martin identified Harden as the man who destroyed his phone and whom he had punched. According to Martin, he and Harden began "tussling and wrestling and stuff; and a lot of people started pulling us back from each other trying to, like, get in between and break it up. And then a gunshot went off." Martin testified no one was attacking Harden except himself. During this interaction, he believed Brown was still in the nightclub, Martin stated he did not have a gun that night. Videos from Snapchat taken by Martin that night were admitted as evidence. Martin stated that Brown is shown entering the parking lot on one video. After the gunshot, everyone scattered, and Martin observed his cousin lying on the ground. Martin went to him and attempted life-saving measures. He did not see Harden after his cousin was shot.

During cross-examination, Martin testified that while he was fighting with Harden, he never observed a gun and never observed Brown approach.

**Heather Wilson**

Heather Wilson is a detective with the Beaumont Police Department and was the lead detective on this case. On December 25, 2020, she arrived on the scene about 2:45 a.m. and worked with officers to secure the scene. Wilson identified a gray Chevy Impala in the parking lot and testified that law enforcement received permission to search the car from Harden's nephew, Arthur Pierson, the owner of the car. Harden came to the club that night in the gray Impala, while his nephew

7

drove another car, a white Kia Optima. The nephew admitted that he had a .40 caliber gun in his Kia Optima that night. The officers also found a Glock .45 in Brown's vehicle that night. Wilson testified these guns are not the same as a 9-millimeter handgun. A cartridge casing and a live .380 round were found at the scene. Wilson also retrieved the bullet from Brown's body after his autopsy.

Wilson testified that on Christmas Day, Harden's nephew participated in a recorded interview at the police station. After exiting the interview room, Pierson continued to speak to an officer and the officer activated his body camera. Pierson then called his mother, Harden's sister, Lillie Harden, on speaker phone in front of the officer.[2] Lillie gave the officer a number to reach Harden, but all attempts to locate him were unsuccessful.

According to Wilson, "[o]nce an arrest has been made or a probable cause for a warrant has been made, then I'll submit paperwork at that time for -- to go along with the warrant." But this case was prolonged because it took five months after the arrest warrant was issued to get Harden into custody.

**Lillie Harden**

Lillie Harden is Harden's sister. She identified her brother in the courtroom and testified that although she arrived at the nightclub parking lot after the shooting,

---

[2]We refer to Lillie by her first name because she shares the same last name as the appellant.

she had no recollection about the events that transpired that day. In a hearing outside the jury's presence, the State played a redacted version of the officer's body camera footage taken when her son called her after his police interview to refresh her recollection of events that day. Back in the jury's presence, Lillie testified that on December 25, 2020, she had a phone conversation with her son, with law enforcement listening to the phone conversation. In the phone call, Lillie tells Pierson that Harden called her, admitted to the shooting, and that he asked her to give law enforcement his social security number. She also gave law enforcement Harden's phone number.

**Cody Foote**

Cody Foote testified that he is a patrol supervisor with the Beaumont Police Department. On December 25, 2020, he helped secure the scene at the nightclub. He spoke to both Pierson and Lillie, and they both told him that they had not witnessed the shooting. He determined that they were not witnesses and said it was "okay" for them to leave the scene. He later learned that Pierson had potentially been with Harden that night. After confirming that Pierson was a potential witness, he detained him, and, due to Pierson's intoxication, Foote placed him in handcuffs in his patrol car. When Pierson told Foote he had a handgun in his vehicle, Foote retrieved the handgun. Foote confirmed that both the white Kia Optima and the gray Chevy Impala were towed from the scene by law enforcement.

9

**Andrew Allen**

Andrew Allen is a police officer who was on the scene in the early morning hours of December 25, 2020. A copy of his body camera footage was admitted and played for the jury. Allen also testified that he spoke to Martin that night and he testified that Martin told him he knew nothing about what happened that night.

**Scott Zelner**

Scott Zelner testified that he works as an officer with the Beaumont Police Department. On May 25, 2021, he received a tip as to Harden's location but failed to locate Harden.

**Anessa Barnette**

Anessa Barnette works as an ID technician with the Beaumont Police Department. Four days after the shooting Barnette was contacted by Wilson to photograph a vehicle. She photographed the exterior and interior of the vehicle and the .45 Glock and live ammunition found in the vehicle. The gun and the ammunition were processed and sent to the regional crime laboratory.

**Other Witnesses**

Testimony was elicited from the forensic pathologist regarding Brown's autopsy, and she testified that his death was a homicide. Photographs of the autopsy were admitted without objection. Photographs were taken of Brown's hand to

10

determine whether there was any type of physical altercation, and the forensic pathologist testified there were no recent injuries on his hands.

A firearm examiner for the Jefferson County Regional Crime Laboratory also testified as to his review of the guns recovered, the .40 Taurus recovered from Harden's vehicle, and the .45 Glock recovered from Brown's vehicle at the scene and the bullet removed from Brown's body during the autopsy. He determined the bullet found in Brown's body was not fired by either gun.

**John Fitzgerald Manuel**

John Fitzgerald Manuel testified for the defense. On December 25, 2020, he was working the door as security for the nightclub. He testified that multiple people were working at the nightclub that night, including Price. That night he was tasked with getting everyone out of the club at closing time. As he walked a lady to her car, he heard yelling and told the crowd to "cut it out[.]" He then turned back to break up the fight. When he reached the fight, he observed a "female pulling a guy off [Harden]." According to Manuel, Harden then started to walk the "opposite way" and the guy who had been fighting Harden, "[j]umped up, [and] hit [Harden] from behind." Harden then turned around and shot the man. He testified that after Harden shot the man, Harden "froze" and appeared "shocked he shot him." Manuel then told Harden to "get away" from the victim, to leave, and Harden left, running away. Manuel did not see any part of the incident that led up to the shooting. Manuel

11

testified that he gave the police his contact information on December 25, 2020, but denied that he gave any formal statement to the police regarding the shooting. He believed it was law enforcement's job to contact him. He confirmed that he has known Harden since the 80's and that he is a friend whom he would talk to at events and parties, but he has not been to Harden's home. Manuel stated he had two drinks that night. According to Manuel, Price did not like Harden.

**Chancellor Van Houten**

Chancellor Van Houten is a police officer for the Beaumont Police Department and testified as a rebuttal witness for the State. Van Houten stated he is a patrol officer who worked with other patrol officers to find Harden after his arrest warrant was issued. Van Houten recalled that he was involved with "multiple" occasions in which they received tips of Harden's location only to no avail. Van Houten agreed he was frustrated because it took longer than usual to apprehend Harden.

At the conclusion of testimony, the jury convicted Harden of murder and subsequently sentenced him to life imprisonment in the Texas Department of Criminal Justice. Harden timely filed this appeal.

**Issue One**

In his first issue, Harden challenges the sufficiency of the evidence to support his conviction arguing the State "failed to disprove the self-defense issue beyond a reasonable doubt."

**Standard of Review**

The jury is the exclusive judge of the credibility of the evidence and the weight to be given to that evidence. *Metcalf v. State*, 597 S.W.3d 847, 855 (Tex. Crim. App. 2020). As such, the jury is responsible for resolving conflicts in the testimony, is free to believe some, all or none of a witness's testimony, and may assign as much or as little weight to a witness's testimony as it sees fit. *Id*. Jurors may also draw reasonable inferences from the evidence. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). "[A]n inference is a conclusion reached by considering other facts and deducing a logical consequence from them." *Id*. at 16.

When examining whether a criminal conviction is supported by legally sufficient evidence, we compare the evidence to the elements of the offense as defined by a hypothetically correct charge. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). We consider all the evidence, viewed in the light most favorable to the verdict, along with the inferences that could reasonably be drawn from the evidence. *Hooper*, 214 S.W.3d at 13. We do not assess the credibility of

the evidence, reweigh the evidence, nor substitute our judgment for that of the jury. *See Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007).

The evidence is legally sufficient to support the conviction if any rational trier of fact could have found each of the essential elements of the offense beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979). "Each fact need not point directly and independently to a defendant's guilt, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Balderas v. State*, 517 S.W.3d 756, 766 (Tex. Crim. App. 2016) (citation omitted); *see also Garcia v. State*, 667 S.W.3d 756, 761-62 (Tex. Crim. App. 2023) (citation omitted) ("A proper review of evidentiary sufficiency considers the cumulative force of the evidence.").

A person commits murder if he intentionally or knowingly causes the death of an individual or intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes death. Tex. Penal Code Ann. § 19.02(b)(1), (2). Texas recognizes the general defense of justification, which excludes criminal responsibility for otherwise criminal behavior. *Id*. § 9.02. Self-defense is one form of justification. *Id*. § 9.31. A person is justified in using force against another when and to the degree he reasonably believes the force is immediately necessary to protect himself against the other's use or attempted use of unlawful force, and is justified in using deadly force when and to the degree that he reasonably believes

the deadly force is immediately necessary to protect himself against the other's use or attempted use of unlawful deadly force. *Id*. § 9.31(a), 9.32(a).

The defendant has the initial burden to produce some evidence to support a claim of self-defense. *See Zuliani v. State*, 97 S.W.3d 589, 594 (Tex. Crim. App. 2003). Generally, once a defendant produces some evidence raising the issue of self-defense, the State bears the burden of persuasion to show beyond a reasonable doubt that the defendant's actions were not justified. *Saxton v. State*, 804 S.W.2d 910, 913 (Tex. Crim. App. 1991); *Valverde v. State*, 490 S.W.3d 526, 527-28 (Tex. App.— San Antonio 2016, pet. ref'd). "[A] defendant bears the burden of production and the State bears the burden of persuasion on a defense under Penal Code section 2.03." *Zuliani*, 97 S.W.3d at 594 n.5 (citing *Saxton*, 804 S.W.2d at 913-14). To meet its burden, the State need not produce additional evidence. *Saxton*, 804 S.W.2d at 913; *Valverde*, 490 S.W.3d at 528. If the jury finds the defendant guilty, it has made an implied finding against any defensive theory raised by the defendant. *Saxton*, 804 S.W.2d at 914; *Valverde*, 490 S.W.3d at 528 (citing *Zuliani*, 97 S.W.3d at 594). As stated in *Valverde*,

> When a defendant challenges the legal sufficiency of the evidence to support the jury's implicit rejection of his self-defense claim, "we look not to whether the State presented evidence which refuted appellant's self-defense testimony, but rather [we] determine whether after viewing all the evidence in the light most favorable to the prosecution, any rational trier of fact would have found the essential elements of [the offense] beyond a reasonable doubt and also would have found against appellant on the self-defense issue beyond a reasonable doubt."

15

490 S.W.3d at 528 (quoting *Saxton*, 804 S.W.2d at 914).

Self-defense is a fact issue to be determined by the jury, and the jury is free to accept or reject any defensive evidence on the issue. *See Saxton*, 804 S.W.2d at 913-14. In conducting a legal sufficiency review, we defer to the jury's assessment of the credibility of the witnesses and the weight to be given to their testimony. *Brooks v. State,* 323 S.W.3d 893, 899 (Tex. Crim. App. 2010); *Valverde*, 490 S.W.3d at 528.

Harden argues that the State failed to negate that he acted in self-defense. According to Harden, it is undisputed that he was punched in the face by Martin, and the State's own witnesses testified blows to the face can cause serious bodily injury.

Martin testified Harden smashed his phone after he filmed a fight between two women. Martin stated that he punched Harden but that no one else attacked Harden. Price testified that Harden did not appear to be in any apparent danger of being attacked by anyone before the shooting and that he did not believe there was any reason for Harden to have shot and killed Brown. Finally, testimony showed that Harden fled from the scene and was not arrested for several months after his arrest warrant was issued. *See Bigby v. State*, 892 S.W.2d 864, 884 (Tex. Crim. App. 1994) ("Evidence of flight, unlike many other extraneous offenses, shows a consciousness of guilt of the crime for which the defendant is on trial."); *Devoe v. State*, 354 S.W.3d 457, 470 (Tex. Crim. App. 2011) (citing *Alba v. State*, 905 S.W.2d 581, 586 (Tex. Crim. App. 1995)).

16

Because the jury charge included an instruction on self-defense, yet the jury found Harden guilty, the jury implicitly rejected Harden's claims that he acted in self-defense. *See Zuliani*, 97 S.W.3d at 594-95. The jury could have disbelieved he acted in self-defense. *See Metcalf*, 597 S.W.3d at 865; *Saxton*, 804 S.W.2d at 913-14. Viewing the evidence in the light most favorable to the verdict, we conclude that a rational jury could have found against Harden on his claim of self-defense beyond a reasonable doubt. *See* Tex. Penal Code Ann. §§ 9.31, 9.32; *Saxton*, 804 S.W.2d at 913-14. We overrule Harden's first issue.

## Issue Two

In issue two, Harden argues the trial court erred in admitting Price's testimony that no witnesses contacted the police about the shooting because "[t]hey're afraid of Fredrick Harden."

A trial court's admission or exclusion of evidence is reviewed on appeal for abuse of discretion. *Martinez v. State*, 327 S.W.3d 727, 736 (Tex. Crim. App. 2010). "The trial court abuses its discretion when it acts without reference to any guiding rules and principles or acts arbitrarily or unreasonably." *Rhomer v. State*, 569 S.W.3d 664, 669 (Tex. Crim. App. 2019). We overturn a trial court's ruling on the admission or exclusion of evidence only when the ruling is so clearly wrong that it lies outside the zone of reasonable disagreement. *See Taylor v. State*, 268 S.W.3d 571, 579 (Tex. Crim. App. 2008). If the trial court's evidentiary ruling is correct on

17

any theory of law applicable to the case, that ruling will not be disturbed even if the trial judge gave the wrong reason for the correct ruling. *De La Paz v. State*, 279 S.W.3d 336, 344 (Tex. Crim. App. 2009).

The State's question, defense counsel's objection, the court's ruling, and the witness's answer were as follows:

> [THE STATE]: All right. Do you know why nobody else really has stepped up from the parking lot and the individuals that were there at the scene?
>
> [DEFENSE COUNSEL]: I'm going to object to speculation, Judge.
>
> THE COURT: If he knows, he can answer it. It wouldn't be speculation if he knows. Overruled.
>
> [PRICE]: Yes. They're afraid of Fredrick Harden.

The trial court may have reasonably concluded the question, as phrased, did not call for speculation. The question did not ask Price to say why nobody stepped up to help the police; it asked Price *whether he knew* why nobody had done so. The question, as phrased, called for a "Yes" to indicate he knew, or a "No" to indicate he did not know. The trial court acted within its discretion in overruling the objection. Price then answered, "Yes[,]" indicating that he knew why nobody was stepping up, and then volunteered, "They're afraid of Frederick Harden[,]" which was nonresponsive, but to which there was no objection.

But even if the State's question impliedly called on Price to say why people were not stepping up, the record does not establish Price was required to speculate

18

in order to answer the question. According to Price, he knew why people were not stepping up. "Evidence to prove personal knowledge may consist of the witness's own testimony." Tex. R. Evid. 602. Price testified:

> Q. Did you yourself try to get people to talk to police and try to tell what took place?
>
> A. Yes, sir.
>
> Q. And did you see anybody cooperating other than you and the man who had his cell phone taken?
>
> A. No, sir.

To the extent Price relied on these conversations as the basis for knowledge, he may have explained (if asked) that people told him they were afraid of Harden, and such testimony may have been admissible under an exception to the hearsay rule allowing for the admission of out-of-court statements regarding a declarant's then-existing state of mind or emotional condition. *See id*. 803(3). To the extent Price's testimony constituted an opinion that people were afraid of Harden, he may have explained (if asked) that he saw how people reacted when he asked them to cooperate, and this testimony may have been admissible under Rule 701 which allows for the admission of lay opinions so long as they are rationally based on the witness's perception and are helpful to a clear understanding of the witness's testimony or the determination of a fact in issue. *See id*. 701. The record does not establish Price relied solely on speculation when testifying why people were not

19

stepping up to help the police. We conclude the trial court's ruling was within the zone of reasonable disagreement, and we overrule Harden's second issue.

**Issue Three**

In his third issue, Harden asserts, "Fundamental error occurred when the prosecutor misstated the law of self-defense to the jury." During closing argument, counsel for the State argued in relevant part:

> To decide the issue of self-defense, you must determine whether the State has proved beyond a reasonable doubt one of the two -- one of the following two elements. Remember, that's my burden. I don't shift it. I don't say it belongs to anybody else. I say it's solely my responsibility.
>
> I'm telling you, my opinion is that I have met this burden because -- and I'll tell you why as we go through this -- number one, the defendant did not believe his conduct was immediately necessary to protect himself against [Brown's] use or attempted use of unlawful deadly force.
>
> One witness testifies -- that's the man they got up here today. Did he ever say who Mr. Harden believes? No. So we have no evidence. None. You can't make that decision one way or the other.
>
> Two, the defendant's belief was not reasonable. So now you've got to guess. You've got to ask yourself what he did that day in choosing to pull a gun out and kill somebody, was that reasonable? In making that decision, you don't ask yourself if he thought that he was being reasonable. You ask yourself, would a reasonable person do that; right?

Harden did not object to this argument during trial, but on appeal, he complains that "telling the jury that they are not to consider whether appellant believed his actions were reasonable contravenes the applicable law and constituted fundamental error." The State responds by arguing that Harden failed to preserve the

20

issue for appellate review, and that the State's closing argument was proper, but if improper, curable and harmless.

"To preserve an issue for appellate review, a party must lodge a timely objection and state the specific legal basis for the objection." *Sartin v. State*, 680 S.W.3d 663, 667 (Tex. App.—Beaumont 2023, no pet.); Tex. R. App. P. 33.1. "Preservation of error is a systemic requirement on appeal." *Ford v. State*, 305 S.W.3d 530, 532 (Tex. Crim. App. 2009). When an issue is not preserved for appeal, the court of appeals should not address its merits. *Id.*

Harden argues he was not required to object, because the State's argument was incurable. "Even incurably improper jury argument is forfeitable." *Hernandez v. State*, 538 S.W.3d 619, 623 (Tex. Crim. App. 2018). "[A] defendant's 'right' not to be subjected to incurable erroneous jury arguments is one of those rights that is forfeited by a failure to insist upon it. Therefore, we hold a defendant's failure to object to a jury argument or a defendant's failure to pursue to an adverse ruling his objection to a jury argument forfeits his right to complain about the argument on appeal." *Cockrell v. State*, 933 S.W.2d 73, 89 (Tex. Crim. App. 1996) (citing *Marin v. State*, 851 S.W.2d 275, 279 (Tex. Crim. App. 1993), and *Campbell v. State*, 900 S.W.2d 763, 774-77 (Tex. App.—Waco 1995, no pet.) (Thomas, C.J., concurring)).

"Where a prosecutor misstates the law about the burden of proof, the appellant must object to preserve his complaint." *Carr v. State*, No. 09-22-00266-CR, 2024

Tex. App. LEXIS 3340, at *12 (Tex. App.—Beaumont May 15, 2024, no pet. h.) (mem. op.) (not designated for publication); *see also Robinson v. State*, 685 S.W.3d 217, 223-24 (Tex. App.—Fort Worth 2024, no pet.) (collecting cases holding that "complaints about a prosecutor's comments must be preserved by objection"). Because Harden did not object to the challenged argument, nothing was preserved for our review. We overrule Harden's third issue.

## Conclusion

Having overruled all issues, we affirm the judgment of conviction.

AFFIRMED.

KENT CHAMBERS
Justice

Submitted on May 5, 2025
Opinion Delivered October 29, 2025
Do Not Publish

Before Golemon, C.J., Johnson and Chambers, JJ.

22